UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | |
|---|---|
| AMERICAN CASUALTY COMPANY OF READING, PENNSYLVANIA, as subrogee of Pal-Con, LLC, doing business as Pal-Con, Ltd., et al., <br><br> Plaintiffs, <br><br> V. <br><br> REYNOLDS CONCRETE PUMPING, LLC, <br><br> Defendant, | Civil Action No. 5: 19-488-DCR <br><br> **MEMORANDUM OPINION AND ORDER** |

\*\*\* \*\*\* \*\*\* \*\*\*

This matter involves an industrial accident in which Reynolds Concrete Pumping, LLC ("Reynolds") damaged an air-cooled heat exchanger that Pal-Con, LLC ("Pal-Con") paid to replace. Pal-Con's insurer, American Casualty Company of Reading Pennsylvania ("ACC"), reimbursed Pal-Con's expenses, in part. Now, ACC and Pal-Con ("the plaintiffs") seek to recover their costs from Reynolds. The matter is pending for consideration of the plaintiffs' motion to exclude the opinions of Reynolds' expert witness, Jack Young. [Record No. 51] Likewise, Reynolds has filed a motion to exclude the opinions of the plaintiffs' expert witness, Wayne Taylor. [Record No. 52] Reynolds also has filed a motion for partial summary judgment. [Record No. 53]

For the reasons that follow, Reynolds' motions to exclude the opinions of Wayne Taylor and its motion for partial summary judgment will be granted. Further, the plaintiffs' motion to exclude Jack Young's opinions will be denied.

## I. Background

Pal-Con is in the business of manufacturing and servicing heat exchangers for commercial customers. Sometime prior to June 8, 2018, Texas Eastern Transmission, LP ("Enbridge") hired Pal-Con to build a compressor station at its natural gas plant in Owingsville, Kentucky. On June 15, 2018, Pal-Con sub-contracted with Reynolds Concrete to provide concrete pumping services at the work site.

On June 18, 2018, a Reynolds employee arrived at the natural gas plant with a boom concrete pump, which the employee positioned directly over one of Enbridge's existing compressor stations. The compressor station contained a horizontal air-cooled heat exchanger, alternatively referred to as a closed-loop cooler or "fin-fan," which forces air over a set of coils to cool machinery. As the Reynolds employee began to prime the pump with concrete, a portion of the boom broke, and concrete "rained down onto the fin-fan, the fin-fan's component parts, and the Pal-Con employees ('the Incident')." [Record No. 19, ¶ 13] It appears the damaged equipment was not part of Pal-Con's ongoing construction project, as the parties agree that the damaged unit had been in operation since the late 1960s.

Pal-Con employee Jeff Piele directed the Reynolds driver to swing the boom so that the concrete would stop pouring onto the fin-fan. Once the boom concrete pump stopped pumping concrete, Pal-Con employees immediately began to remove the concrete from the fin-fan and its component parts. However, the weight of the concrete and the velocity of the spill caused the fin-fan coils to bow and the fin-fan fins to crush. *Id.* ¶ 16. During clean up, Piele directed the Reynolds employee to a location where he could clean off the surface of the boom concrete pump. According to the plaintiff, the Reynolds employee advised Piele that Reynolds knew

the pipe that comprised the boom was thin and needed to be replaced. The Reynolds employee then presented Piele with paperwork, which Piele did not review and refused to sign. *Id*. ¶ 20.

For reasons not stated by the plaintiffs, Pal-Con took on the responsibility of repairing or replacing Enbridge's damaged equipment. After determining that the damage was beyond repair, Pal-Con contracted with Smithco Engineering to manufacture a new closed loop cooler. While the final cost of the new cooler was $198,085.00, Pal-Con contends it sustained a total loss of $330,370.40 in parts and labor to clean the concrete spill and remove and replace the damaged equipment. Pal-Con submitted a claim to ACC and, pursuant to the terms of its insurance policy, ACC reimbursed Pal-Con $193,841.56.

ACC filed this action as Pal-Con's subrogee on December 17, 2019, alleging that Reynolds breached the parties' oral contract to provide concrete pumping services and that it was negligent based on its conduct during the June 18, 2018 incident. ACC and Pal-Con subsequently amended the Complaint, asserting that ACC is subrogated to the rights of Pal-Con to the extent of $193,841.56, but seeking total recovery of $330,370.40.[1] The plaintiffs and defendant now seek to exclude the testimony of the other's expert witness and Reynolds has moved for partial summary judgment. The primary dispute between the parties is the fair market value of the damaged air-cooled heat exchanger, which was approximately fifty years old at the time of the loss.

---

[1] In response to Reynolds' motion for partial summary judgment, the plaintiffs report that they are seeking $274,600.38, "which represents the $330,370.40 total loss minus the depreciated value of the damaged closed-loop cooler." [Record No. 55, pp. 6-7]

## II. The Motions to Exclude Expert Testimony

### A. The Standard of Review

Testimony of expert witnesses is governed by Rule 702 of the Federal Rules of Evidence. It allows expert witnesses to provide opinion testimony if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. These factors apply even if the expert's opinion is "technical" rather than scientific in nature. *See Kuhmo Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999).

The Sixth Circuit has determined, based on Rule 702, that an expert's opinion is admissible if it satisfies three requirements. "First, the witness must be qualified by knowledge, skill, experience, training, or education. Second, the testimony must be relevant, meaning that it will assist the trier of fact to understand the evidence or to determine a fact in issue. Third, the testimony must be reliable." *In re Scrap Metal Antitrust Litigation*, 527 F.3d 517, 529 (6th Cir. 2006) (internal quotation marks and citations omitted). And while the Court is not required to conduct a *Daubert* hearing to determine the admissibility of expert testimony, it must ensure that the disputed testimony is relevant and reliable. *Cutter v. Ethicon, Inc..*, 2020 WL 2060342, at *4 (E.D. Ky. Apr. 29, 2020) (citing *Vaughn v. Konecranes, Inc.*, 2015 WL 163431, at *2 (E.D. Ky. Apr. 13, 2015)); *Clay v. Ford Motor Co.*, 215 F.3d 663, 667 (6th Cir. 2000).

### A. Reynolds' Motion to Exclude the Opinions and Testimony of Wayne Taylor

Wayne Taylor is Vice President and Senior Consultant of Industrial Loss Consultants, Inc. ("ILC"). Taylor explained that ILC serves the commercial property and casualty insurance industry, providing damage assessments following "peril events," which insurance adjusters use to settle claims with their clients. [Record No. 52-2, pp. 31, 37] CNA Insurance retained ILC on July 3, 2018, to investigate damage to the subject property.[2] The scope of Taylor's assignment was to inspect the damaged property; determine whether it could be repaired to its pre-loss condition; validate the Pal-Con's costs to restore the damaged unit; calculate the actual cash value of the restoration costs; and calculate the fair market value of the damaged heat exchanger.

Taylor worked in sales of closed-loop air coolers prior to being hired at ILC in 2000. [Record No. 52-2, pp. 33-34] At the time he issued his report, he held no professional licenses or certifications, but asserted that he learned to value machinery through on-the-job training at ILC. [Record No. 52-2, pp. 31, 39] During his time at ILC, he worked on approximately 24 cases involving damage to closed-loop coolers. He had not attended any continuing education courses focused on insurance adjusting, appraisal, or valuation techniques and methodology. *Id.* p. 40. Taylor conceded that he did not apply a particular standard of care to his methodology in this case. Instead, he applied ILC's protocol and "procedures on how [they] perform [their] work." *Id.* p. 53. He stated these procedures are not documented anywhere.

---

[2] ACC is the underwriting company for CNA. [Record No. 53-5, p. 11]

Further, Taylor did not refer to any outside sources to assist him in determining the value of the damaged air cooler.

Taylor opined that, due to the extent of damage to the coils, repair of the closed-loop cooler to its pre-loss condition was not possible. This was because the fins were bent and deformed to the point that a process commonly known as "combing the fins" would not allow a comb to be inserted. Another alternative would have been to have a replacement for the top level of tubes and fins fabricated. However, this would have far exceeded the time permitted for Pal-Con's project.[3]

Taylor proceeded with a replacement cost analysis. He reported that ILC was unable to find a like kind and quality replacement for the damaged unit on the market. [Record No. 52-2, p. 154] ILC's market search was performed by an online internet search of used equipment dealers who commonly have closed-loop coolers for sale. When ILC was unable to find a replacement product on the market, it sought to obtain a construction bid from a vendor. ILC contacted Dan Pike with Flow Solutions in Muncie, Indiana. However, Flow Solutions declined to bid on the project due to the time constraints regarding delivery.

Taylor then set out to evaluate Pal-Con's proposed bid from Smithco to replace the cooler at a cost of $330,370.40.[4] Smithco had previously provided a similar heat exchanger to

---

[3] It is unclear how Taylor reached this conclusion. He denied knowledge of any details regarding Pal-Con's work at the Enbridge facility other than that it was "an update project." [Record No. 52-2, p. 9] According to Reynolds, the damaged cooler had been in service since 1969 and was not part of the equipment Pal-Con was installing on June 18, 2018. [*See* Record No. 53-1.]

[4] The original proposed cost was $500,088.00, but was later reduced to $330,370.40. Taylor denied that Pal-Con replaced the equipment on its own and then sought reimbursement from CNA. He also denied knowledge of any conflict between CNA and Pal-Con regarding the value of the equipment. [Record No. 53-4, p. 52]

Pal-Con and was willing to use the design from the previous unit, therefore eliminating a design charge for the replacement unit. The Smithco estimate included $198,085.00 for a new unit. The remaining costs were for labor and other equipment, materials, and "handling." Taylor concluded that these costs were "in line with the scope of work which required Pal-Con to disconnect the damaged Closed-Loop Cooler from the operating system and power supply, extract the Closed-Loop Cooler and components, and finally ship then install the new Closed-Loop Cooler." [Record No. 52-2, p. 155] Accordingly, he validated these replacement costs.

Taylor went on to calculate the damaged heat exchanger's actual cash value, which he defined as "the sum of money the insured goods would have brought for cash, at market price, at the time when, and place where the insured goods were destroyed." *Id.* He arrived at a value of $99,042.50 by depreciating the final cost of the new cooler ($198,085.00) by five percent for ten years. Reynolds contends that Taylor's proposed testimony is not a product of reliable principles and methods and would likely be detrimental to the trier of fact in determining damages in this case. Notably, Taylor had never applied, or even heard of, the Uniform Standards of Professional Appraisal Practices and could not identify any authorities, treatises, or other accepted standards in accordance with which his valuation techniques were performed.

During his deposition, Taylor conceded that his methodology was based on "ILC protocol and procedures," which are not documented. Additionally, he did not consult any outside sources such as professional publications or treatises when performing the appraisal in this case. Instead, Taylor explained during his deposition, if equipment is still "fully functional for its designed and intended purpose," depreciation is capped after ten years. [Record No. 52-2, p. 134] He reported that this practice is "generally accepted by the insurance industry"

and he was not aware of any instance in his 20 year career that an insurance company had "rejected [the] fifty percent cap." *Id.* p. 133. While he did not account for any additional depreciation based on the cooler's age of approximately 50 years, he added that if a piece of equipment had been abandoned and was "just sitting in a corner collecting dust," it would be depreciated down to scrap value. Taylor clarified that labor, material handling, and expenses are not depreciated. *Id.* p. 132.

Taylor next reported on the fair market value of the damaged closed-loop cooler. Fair market value is defined as "the price that a willing seller will take and a willing buyer will pay for property, neither being under any compulsion to sell or buy and both being in possession of all relevant information regarding the property." *Wilhite v. Rockwell Intern. Corp.*, 83 S.W.3d 516, 522 n.6 (Ky. 2002). He observed that the cooler was "engineered, designed and built specifically for the application and sold to the owner as part of a compressor system" and would, therefore have little to no value to another user who was not operating a similar application. [Record No. 52-2, p. 156] Accordingly, Taylor concluded, "based on the facts and evidence considered, ILC's specialized appraisal knowledge, and application of fair market principals," that the cooler "was a unique good for which a fair market value could not be determined." *Id.*

To be admissible, expert testimony must be relevant and "have a reliable basis in the knowledge and experience" of the expert's discipline. *Multimatic, Inc. v. Faurecia Interior Sys. USA, Inc.*, 358 F. App'x 643, 652 (6th Cir. 2009) (quoting *Daubert v. Merrell Dow Pharms.*, 509 U.S. 579, 592 (1993)). Taylor undoubtedly has experience with closed-loop coolers, but his opinions regarding the actual cash value and fair market value of Enbridge's closed-loop cooler prior to the incident are not reliable.

First, his opinions were rendered for the purposes of settling an insurance claim, which is different than a neutral evaluation of actual cash and/or fair market value. *See, e.g., Fox v. Admiral Ins. Co.*, 2016 WL 6476461, at *4 (N.D. Ill. Nov. 2, 2016) (expert's opinions reflected his analysis of how to value a claim for settlement purposes, based on his experience in the insurance industry, but were not reliable with respect to potential jury verdict). More importantly, his evaluation of actual cash value was not based on any method recognized by professional appraisers but, instead, on an informal practice he claims is accepted within the insurance industry. And while he stated that his determination of fair market value was based on "specialized knowledge" and "fair market principals," he did not actually articulate the bases for his conclusion. Ultimately, the court should not admit expert testimony that is supported only by the *ipse dixit* of the expert. *Nelson v. Tenn. Gas Pipeline Co.*, 243 F.3d 244, 254 (6th Cir. 2001) (citing *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997)). For these reasons, Reynolds' motion to exclude Taylor's opinions will be granted.

**B.     The Motion to Exclude Opinions and Testimony of Jack Young**

Reynolds retained Jack Young, a senior appraiser with Norcal Valuation, to review the credibility of Taylor's report and determine the actual cash value and fair market value of the closed-loop cooler prior to the incident. Young explained during his deposition that, as "an accredited senior member of the American Society of Appraisers," he is obligated to follow the Uniform Standards of Professional Appraisal Practice ("USPAP") except when other factors, such as the existence of an international transaction, indicate that a different standard should apply. [Record No. 51-4 pp. 13, 20] Young ultimately concluded that, prior to the concrete spill, the condition of the cooler amounted to "salvage or scrap" and its value was $26,500.00.

The plaintiffs first object to the methodology Young applied in determining the value of the closed-loop cooler. Young began by assuming a cost new installed of $330,370.00, based on Pal-Con's total costs. He noted that Taylor's method of depreciating the equipment by five percent each year equates to a 20-year life. [Record No. 51-3, p. 17] He went on to cite the American Society of Appraisers Machinery & Technical Specialties Committee's 2010 Estimated Normal Useful Life Study, which also indicated that heat exchangers have a useful life of 20 years. This useful life estimation was further supported by a conversation he had with Dan O'Leary of Phoenix Equipment in Red Bank, New Jersey, who opined that after 20 years, a heat exchanger would only be worth its scrap value. *Id.* Accordingly, Taylor reported, the heat exchanger had outlived its useful life by approximately 30 years.

Young also relied on the Marshall Valuation Cost Manual, which provides that salvage value (the value when fully depreciated) is between fourteen and six percent for many types of equipment. However, "refrigerating equipment" is specifically listed in § 97 of the Marshall manual as having an eight percent salvage value. *Id.* p. 18. Young concluded that the closed-loop cooler's actual cash value and fair market value was eight percent of the cost new ($330,370.00) or $26,500.00.[5] *Id.* p. 20. Young explained that this value was based on the closed-loop cooler's age and resulting functional and economic obsolescence.

The plaintiffs contend that Young erred in depreciating the labor costs associated with removing the old closed-loop cooler and installing a new one. Specifically, the plaintiffs rely on *Hicks v. State Farm Fire & Cas. Co.*, 751 F. App'x 703, 711 (6th Cir. 2018), and *Bailey v. State Farm Fire & Cas. Co.*, 2015 WL 1401640, at *5 (E.D. Ky. Mar. 25, 2015), in support of

---

[5] Young reported that the closed-loop cooler's actual cash value and fair market value-installed would be the same. [Record No. 51-3, p. 13]

the argument that only the $198,785.00 allocated to the new closed-loop cooler was subject to depreciation. [Record No. 51-1, pp. 11-12 (citing *Bailey v. State Farm Fire & Cas. Co.*, 2015 WL 1401640, at *5 (E.D. Ky. Mar. 25, 2015)].

Young defined actual cash value as a "value common to insurance policies for which value is predicated on replacement cost new less depreciation . . . ." [Record No. 51-3, p. 23] Not surprisingly, the *Bailey* and *Hicks* decisions involved an insurer's determination of the actual cash value of damaged property under an indemnity insurance policy. Generally, cases involving actual cash value (including *Bailey* and *Hicks*) look to the relevant insurance policy to determine the applicable definition of actual cash value. While Reynolds would not necessarily be bound by it, Taylor did not provide the insurance policy definition of actual cash value or otherwise reference the policy in his report.

Since ACV is a valuation method used predominantly in the insurance industry, it is not surprising that there is a lack of case law applying that term outside the insurance context. However, in determining that *an insurer* may not depreciate the cost of labor when it calculates the actual cash value of structural loss, the court discussed at length the purpose of insurance and the contours of the insurer-insured relationship. *Bailey*, 2015 WL 1401640, at *5-6. Notably, it observed that the insurer had drafted the contract and therefore its terms would be construed strictly against the insurer and in favor of the insured. *Id.*

But even in the context of insurance disputes, courts across the country are divided on this issue. *See id.* at *6 (collecting cases). Young was questioned on this topic during his deposition and opined that labor is depreciable under certain circumstances. For instance, he explained, physical labor that is "directly related" to the repair or replacement of damaged property is depreciable. *See e.g., Butler v. Travelers Home & Marine Ins. Co.*, 858 S.E.2d 407

- 11 -

(S.C. 2021) (concluding that embedded labor may be depreciated for purposes of ACV). [Record No. 51-4, p. 76] To the extent the plaintiffs contend that Young's method of depreciation does not fully compensate them for their losses, this is a proper matter for cross-examination.

Next, the plaintiffs argue that Young should not be permitted to testify that the heat exchanger's useful life was 20 years because he would merely be repeating the opinion of Dan O'Leary. However, Young's report is clear that a 20-year useful life was based on the Estimated Normal Useful Life Study by the American Society of Appraisers. Further, it was consistent with Wayne Taylor's method of depreciating the heat exchanger at a rate of five percent per year. Accordingly, the plaintiffs' assertion that Young would merely parrot the opinion of another individual is not supported by the record.

The plaintiffs also contend that Young did not reliably apply his own methodology in reaching his opinions in this case. Specifically, the plaintiffs assert that Young failed to apply an objective assessment as required by Valuing Machinery and Equipment: The Fundamentals of Appraising Machinery and Technical Assets. This guide defines "scrap" as follows:

> This term describes those items of equipment that are no longer serviceable and which cannot be used to any practicable degree regardless of the extent of the repairs or modifications to which they may be subjected. This condition applies to items of equipment that have been used for 100 percent of their useful life or that are 100 percent technologically, functionally, or economically obsolete, no longer serviceable, and have no other value other than for their material content.

[Record No. 51-3, p. 242]

Consistent with this definition, Young explained during his deposition that the heat exchanger was considered scrap due to its age. [Record No. 51-4, p. 41] And, because the item was at the end of its useful life, its reported good working condition was "not that

material." According to Young, typical market participants would opt for a newer, more efficient model that is available in the marketplace. To the extent the plaintiffs believe Young's opinion underrepresents the heat exchanger's value based on its good working condition prior to the incident, this is a proper topic for cross examination.

Finally, the plaintiffs contend that Young's opinions should be excluded because he did not review the deposition testimony of former Enbridge employee, Albert "Buddy" Jackson. [*See* Record No. 51-5.] Jackson, the plant operator responsible for maintenance of the closed-loop cooler from 1976 to 2020, testified that the cooler was monitored constantly and was in excellent condition. Jackson also opined that, while it is consistent with today's industry standard, the replacement closed-loop cooler is less efficient and powerful than the original equipment.

Reynolds points out that Jackson gave his deposition *after* Young provided his report and discovery deposition, so it would have been impossible for Young to consider his statements in forming his opinions. However, Reynolds did consider Jackson's discovery responses related to the maintenance and condition of the closed-loop cooler prior to the concrete spill. Young acknowledged during his deposition the plaintiffs' claims regarding the cooler's excellent working condition, but concluded that the condition did not have a significant impact on the cooler's value because of its age and resulting obsolescence. To the extent the plaintiffs disagree with Young's conclusions, these issues are appropriate for cross-examination.

Based on the foregoing, the plaintiffs' motion to exclude Young's opinions and testimony will be denied.

### III. The Defendant's Motion for Partial Summary Judgment

#### A. The Standard of Review

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). The relevant inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986).

Once the moving party has met its burden of production, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." *Keeneland Ass'n, Inc. v. Earnes*, 830 F. Supp. 974, 984 (E.D. Ky. 1993) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The nonmoving party cannot rely on the assertions in its pleadings; rather, it must come forward with probative evidence to support its claims. *Celotex*, 477 U.S. at 324. In making its determination on the motion for summary judgment, the Court will view all the facts and inferences from those facts in the light most favorable to the nonmoving party. *Matsushita*, 475 U.S. at 587.

#### B.

Reynolds contends that it is entitled to summary judgment regarding Pal-Con's negligence claim. First, Reynolds claims that, as Enbridge's subrogee, Pal-Con stands in Enbridge's shoes and has no greater cause of action than Enbridge would have had it pursued the claim against Reynolds directly. *See Maryland Cas. Co. v. Lincoln Bank & Trust Co.*, 18 F. Supp. 375, 377 (W.D. Ky. 1937) ("The beneficiary of subrogation can acquire no greater

rights than those of the party for whom he is substituted . . . ."). In other words, Reynolds contends that Pal-Con has already been fully compensated by the $193,841.56 it received under its insurance policy with ACC and is barred from recovering additional monies from Reynolds here.

Pal-Con responds that it is not proceeding under a theory of equitable subrogation. Instead, it asserts that its rights arise out of an assignment agreement in which Enbridge assigned its legal rights arising from the incident. Pursuant to the written agreement, Enbridge granted Pal-Con "all of [its] legal rights, of whatever kind or nature, to pursue all third parties that caused or contributed to the Concrete Spill, including but not limited to pursuit of third party Reynolds Concrete Pumping, LLC ("Reynolds")." In response to this argument, Reynolds points out that the word "assignment" does not appear in the Complaint or Amended Complaint. Further, Reynolds contends, the assignment contains an effective date of February 25, 2019, but was not executed until March 11, 2021. [Record No. 58, p. 2] Despite these assertions, Reynolds does not argue that the assignment is unenforceable. Instead, it contends that Pal-Con cannot recover under this theory for the same reason it cannot recover under the doctrine of subrogation. *See Unifund CCR Partners v. Harrell*, 509 S.W.3d 25, 29 (Ky. 2017) (quoting *Whayne Supply Co. v. Morgan Constr. Co.*, 440 S.W.2d 779, 782 (Ky. 1969) ("an assignee . . . acquires no greater right than was possessed by his assignor").

A primary goal of compensatory damages in tort cases is to put the victim is the same position he would have been prior to the injury or to make him whole to the extent it is possible to do so in terms of money. *Schwartz v. Hasty*, 175 S.W.3d 621, 626 (Ky. Ct. App. 2005). In keeping with this objective, the measure of damages to personal property is the difference in fair market value before and after the damage was sustained, otherwise known as diminution

in value. *McCarty v. Hall*, 697 S.W.2d 955, 956 (Ky. Ct. App. 1985). Fair market value is "the price at which an owner who desires to sell but is not required to do so would sell the property in its then condition to a purchaser who desires to purchase but is not compelled to do so." *Com., Dept. of Highways v. Darch*, 374 S.W.2d 490, 491-92 (Ky. Ct. App. 1964). Accordingly, the Court must determine whether there is a genuine issue of material fact that diminution in value of the closed-loop cooler exceeds $193,841.56.

Crediting Wayne Taylor's opinion, the plaintiffs value the cooler itself at $99,042.50. In response to Reynolds' motion, Pal-Con contends that it has presented "a plethora of evidence in the form of invoices, receipts, witness and expert testimony" that establish material issues of genuine fact regarding damages. It is true that evidence regarding the cost of repairs necessary to restore property to its former condition is admissible on the issue of fair market value. *Gheens v. Bush*, 80 S.W.2d 851, 852 (Ky. 1935); *McCarty*, 697 S.W.2d 955; *Shafer Plaza VI, Ltd. v. Lang*, 2008 WL 4754877, at *3 (Ky. Ct. App. Oct. 31, 2008). However, considering this evidence in the light most favorable to Pal-Con, it is unclear how a jury could conclude that the fair market value of the cooler exceeded $193,841.56.

The Court has examined Pal-Con's summary of damages, which are listed as follows:

| | |
|---|---|
| Field Staff Expense | $30,944.75 |
| Operations Staff Expense | $16,143.13 |
| Pal-Con Equipment Time | $4,527.00 |
| Material & Expenses | $242,396.10 |
| Handling 15% | $36,359.42 |

The Court will assume, for purposes of this analysis, that labor costs are not depreciated. Excluding the portion of damages allotted to "material and expenses," the damages total

$87,974.30.[6] Combined with the $99,042.50 allocated to the fair market value of the closed-loop cooler, this totals $187,016.80—about six thousand dollars less than Pal-Con has already been paid.

Pal-Con relies on *Caldwell v. Olshan Found. Repair of Oki, L.P., Ltd.*, 2007 WL 1035122 (E.D. Ky. Apr. 2, 2007), where the court observed that there is an inference that the cost to repair property to its pre-damage state is equal to the diminution in fair market value. *Id.* at *3 (citing *Ellison v. R&B Contracting, Inc.*, 32 S.W.3d 66, 70 (Ky. 2000)). Because the parties' experts provided opposing estimates regarding how much it would cost to repair the basement floor of the residence, the court held that diminution in fair market value was a question of fact for the jury and summary judgment was denied.

*Caldwell* is distinguishable from the present case in important ways. First, *Caldwell* (and *Ellison*, upon which it relies) involved real property. The plaintiffs have not cited any authority applying *Ellison* to disputes involving the valuation of personal property. More importantly, unlike the basement that was repaired to its pre-damage state in *Caldwell*, the closed-loop cooler was replaced altogether. It is undisputed that Pal-Con voluntarily replaced Enbridge's fifty-year-old cooler with a newly manufactured one. Reynolds does not deny that it was responsible for the concrete spill, but contends that forcing it to pay for a new, improved closed-loop cooler would be unjust because it would result in a windfall to Enbridge, placing it in a better position than it was in before the accident. Kentucky courts have long held that "recovery is limited to the cost of restoring the premises to their original condition and not to

---

[6] Pal-Con has not parsed out the items on this list, but it is evident that most of them constitute supplies and/or equipment. However, there are miscellaneous charges for equipment rental and a $13,873.85 charge for "furnish labor and material to hook up new fin fan." [Record No. 51-2]

that of placing them in better condition than they were originally." *Reed v. Mercer Cnty. Fiscal Court*, 295 S.W. 995, 996 (Ky. 1927).

Once the moving party carries its initial burden of showing that no genuine issues of material fact are in dispute, the burden shifts to the non-moving party to come forward with *specific facts* to show that there is a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Reynolds has not identified any specific evidence indicating that the fair market value of the cooler, prior to the accident, exceeded $193,871.00, which ACC already paid to Pal-Con. [*See* Record No. 53-5, p. 126.] Accordingly, Reynolds' motion for summary judgment with respect to Pal-Con's negligence claim against it will be granted.

Reynolds requests partial summary judgment against ACC in the form of a ruling that damages are limited as a matter of law to the diminution of the fair market value of the damaged closed-loop cooler. This measure of damages is consistent with Kentucky law and ACC does not appear to oppose Reynolds' request. *See McCarty*, 697 S.W.2d at 956. Accordingly, this portion of the partial motion for summary judgment will be granted.

### IV.

Based on the foregoing, it is hereby

**ORDERED** as follows:

1. Plaintiffs' motion to exclude the opinions and testimony of Jack Young [Record No. 51] is **DENIED**.

2. Defendant's motion to exclude the opinions and testimony of Wayne Taylor [Record No. 52] is **GRANTED**.

3. Defendant's motion for partial summary judgment [Record No. 53] is **GRANTED**.

Dated: July 13, 2021.

Danny C. Reeves, Chief Judge
United States District Court
Eastern District of Kentucky